FILED

Vivi Stafford, MD
6051 San Vicente Blvd.
Los Angeles, CA 90036
Telephone:    323-360-4670

PAID

NOV 2 0 2018

Clerk, US District Court
COURT 4612

2018 NOV 20  PM 12: 18

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

**CV18-09764** JFW(AGR)

| | |
|---|---|
| Vivi Stafford, MD, an individual | **COMPLAINT FOR:** |
| Plaintiff, | **Violation of Civil Rights Act of 1866 (Section 1981)** |
| v. | |
| Avenal Community Health Center, | |
| Khuong Phui, D.O. | **JURY TRIAL** |
| Does 1 through 5; | |
| Defendants | |

Introduction:

1.) Plaintiff Vivi Stafford, M. D. is an individual.

2.) Plaintiff Vivi Stafford, M.D. is a medical doctor with a license to practice medicine in the state of California and the state of New York.

3.) Plaintiff Vivi Stafford, M.D. has a federal waiver to treat patients for opioid addiction in accordance with the guidelines for physicians.

4.) Plaintiff Vivi Stafford, M. D., (hereinafter "Plaintiff", "Dr. Stafford") brings this action for violation of federal civil rights and retaliation under Violation of the Civil Rights Act of 1866 (Section 1981).

5.) Plaintiff is informed and believes the Defendant the Avenal Community Health Center (hereinafter "ACHC") is a California Corporation, and at all relevant times herein duly organized and existing under and by virtue of the State of California.

6.) Plaintiff is informed and believes that ACHC, for all times relevant herein, is authorized to do business in Fresno County, Kings County and Tulare County.

7.) Plaintiff is informed and believes that Khuong Phui, D.O. is a doctor of osteopathic medicine license by the osteopathic medical board of California. (Exhibit 1)

8.) Plaintiff Dr. Stafford was contacted while at 6051 San Vicente Blvd., Los Angeles, California 90036 to join the team at ACHC.

9.) Plaintiff prays to leave to amend in accordance with California Civil Code if essential for furtherance of justice.

10.)    Avenal Community Health Center (hereinafter **"ACHC"**) is a federally qualified and licensed primary care clinic, providing medical, dental, optometry, and specialty care to underserved communities in Kings, Tulare and Fresno Counties.

Jurisdiction of the Case: This Court has jurisdiction over this matter based on federal question

Pursuant to the Civil Rights Act of 1866 (Section 1981) Plaintiff in Pro Per Vivi Robyn Stafford,

M.D. General Statements and Facts:

STATEMENT OF FACTS

1.) During the summer of 2016 Avenal Community Health Center contacted Dr. Stafford via

email because they stated they needed to employ a physician immediately. The head of human

resources at ACHC Hemanta Mungur sent Dr. Stafford an email while she was at 6051 San

Vicente Blvd. Los Angeles, California, her clinic office.

2.) During that summer of 2016 Dr. Stafford explained to ACHC that she was in Los Angeles,

California and that ACHC was not local for her. ACHC stated that they needed a physician to

commit to their facility for about three years. ACHC stated that having access to Dr.

Stafford's resume they stated she was a good candidate for their facility. The health center

encouraged Dr. Stafford to interview at the facility.

3.) Dr. Stafford drove from Los Angeles County to Lemoore, California to interview with the

facility. At the time, the facility stated that to be employed at the facility, the salary was

advertised as $280,000 a year but that they would offer Dr. Stafford $270,000 per year plus

additional benefits. The additional benefits would include health insurance, dental insurance,

reimbursing for automobile expenses such as gas costs and car wear and tear, cell phone bills

costs and continued medical education and licensing costs. (Exhibit 10)

4.) Dr. Stafford accepted the job and was sent the contract via email at 6051 San Vicente Blvd.

Los Angeles, CA 90036. Dr. Stafford was sent numerous additional documents in Los Angeles, County before Dr. Stafford relocated to treat patients in Fresno County and Kings County.

5.) On or about July 22, 2016, the Plaintiff entered into a Clinical Services Agreement with ACHC.

6.) After Dr. Stafford was encouraged to relocate to the facility she immediately was faced with racially charged statements. The most egregious charged statement was a text message to the healthcare team which referenced a team member as a "nigga".

7.) Dr. Stafford believed and continues to believe that she was being referenced as a "nigga" because she was the only African American to receive the text message. Initially Dr. Stafford received the text message with the belief that the message was sent only to her. However, Dr. Stafford realized after receiving the text message that it was sent to the healthcare team including the medical director of the clinic.

8.) Almost immediately after the medical director received the text message with the reference of "nigga" the medical director began to treat Dr. Stafford differently.

9.) Dr. Stafford was the target of multiple events that were unacceptable as they were racially charged.

    a. Dr. Stafford states that around September of 2016, Christina Castaneda, a receptionist at ACHC, walked up to the Plaintiff, at which time Christina "referred to herself as being half white and half black." as a type of humor. Christina had not identified truthfully as being of decent of African American or African heritage and does not

identify as such except as a joke amongst the staff. Christina Castaneda thought it was funny. Essentially, Christina's comment was offensive as Dr. Stafford did not find the statement to be humorous. Dr. Stafford believed this was done to highlight the race of Dr. Stafford's amongst the healthcare team. Dr. Stafford did not report Christina's "half black" comment to anyone at ACHC at the time it occurred.

b. The computer maintenance department staff member by the name of Michael told a staff member at the ACHC facility that Dr. Stafford would be there for six months at the most. Michael made this statement because he knew that the plan was to coax Dr. Stafford at the facility just long enough to be cleared for federal funding.

c. In or around December of 2016, Betty Mora, a medical assistant at ACHC, asked the Dr. Stafford why the she did not wear a wig, as did an African-American Referral Clerk for ACHC.

d. The CFO of the facility Hemanta Mungur was head of the human resources department and accused Dr. Stafford of possibly stealing the computer based on her race in about May of 2017.

e. In May of 2017 Hemanta Mungur stated that he gets racist statements all the time and they do not bother him. Hemanta Mungur was implying that the n-word statement should not have been offensive to Dr. Stafford.

f. After the N-word was published through clinic employees, a pen was thrown at Dr. Stafford by a technician at the clinic who was frustrated.

g. After the pen was thrown at Dr. Stafford, Dr. Stafford filed a complaint with the

manager of the facility. The manager of the facility was head of the employees rather than the medical director although he had no degrees in healthcare what-so-ever. This was the case as a form of discrimination. Education at the premises did not apply to all employees regardless of race. Race plaid a role in vacating educational levels in the workplace. For example, the manager of the clinic was not a holder of any degree what-so-ever outside of high school and was considered the manager of employees that were supposed to be Dr. Stafford's subordinates based only on race.

h.   The CFO who was head of human resources was aware of Dr. Stafford's immediate complaint of an employee throwing a pen at Dr. Stafford.

i.   The manager was aware of Dr. Stafford's immediate complaint which was also written on a paper at the facility. The manager proceeded to destroy the written handwritten note about the event. The manager then proceeded to change the event to being, Dr. Stafford was sitting in the area but that the pen was not intentionally thrown at Dr. Stafford but intentionally thrown at someone else while Dr. Stafford was sitting at the desk.

j.   Dr. Stafford's report is the pen was thrown at her but did not hit her. Dr. Stafford's report was the pen hit the wall next to Dr. Stafford.

k.   At the facility, Dr. Stafford's hair was criticized based on race. Betty Mora, a medical assistant at ACHC, asked the Plaintiff why the Plaintiff did not wear a wig, as did an African-American Referral Clerk for ACHC. Dr. Stafford believed her hair was nice and was offended that she was encouraged to wear a wig based on racial characteristics which is irrelevant to the job as a physician.

l.  Dr. Phui's gave a review of Dr. Stafford the highest possible score – an "A" – in the vast majority of review categories. Dr. Phui then proceeded to defame Dr. Stafford's level of care by "making up stuff" to discredit her ability in working with patients and their care.

m.  The CFO and CEO hired Dr. Stafford which is unlawful. Dr. Phui had the obligation to hire Dr. Stafford as he was the medical director. Based on race, Dr. Phui condoned negligent behavior towards Dr. Stafford based on her race.

n.  After Dr. Stafford reported the N-word to the clinic and other incidents of discrimination, it was an administrative decision to end Dr. Stafford's employment. This administrative decision was made by the CEO and the CFO which is unlawful. Khuong Phui had nothing to do with the discrimination at the workplace because of Dr. Stafford's race. Additionally, the facility has a zero tolerance policy. The zero tolerance policy at the clinic is designed that the individual who was discriminated against is terminated with severance.

o.  Indentured servitude ensued as Dr. Stafford was terminated; it was indentured servitude because she was forced off the premises, a non-performance document was handed to her by non-physicians and the clinic continued to use Dr. Stafford's credentials for at least one month. Dr. Stafford had patients that she was obligated to see. This occurred because of the complaints Dr. Stafford had made about racial statements made to her at the facility.

p.  Other healthcare professionals, were permitted to see their patients during their last 30 days, because of Dr. Stafford's race she was considered unworthy to care for her

– 7 –

patients.

q. Christina Castaneda made a statement that mixed race people, Caucasian and African American was disgusting. The facility changed the story that Christina was saying that mixed race disgusting to the lunch meal of fish was disgusting. Then the clinic determined that Christina Castaneda had the right to give her personal opinions about mixed races at the facility and her opinion of them being disgusting is not a form of discrimination.

r. The clinic encouraged Dr. Stafford to apply for a fellowship. The clinic administration encouraged this as a joke so Dr. Stafford would be rejected from the program. When Dr. Stafford was not rejected from the program, the clinic acted immediately to get Dr. Stafford's offer reversed based on Dr. Stafford's race.  (Exhibit 8)

s. The CFO states the Dr. Stafford mentioned the N-word in the workplace as it was sent to Dr. Stafford through a staff text chain. This statement by the CFO is true.

t. Dr. Stafford and her fiancé were not included in events on a work related retreat with ACHC because of her race. After Dr. Stafford complained of being excluded she was then allowed to participate in some events along with her fiancé. (Exhibit 19)

u. On May 31st, 2017 the CEO wrote in a letter "this memo is to confirm that we discussed at length the each of the harassment and discrimination complaints you had raised in your previous correspondence." The CFO and CEO demanded Dr. Stafford to not come to the premises anymore on May 31st, 2017 only because of the complaints Dr. Stafford had made about harassment and discrimination. (Exhibit 2)

    v.  The CEO had threatened Dr. Stafford and told her that if she reported the racial statements that there would be serious ramifications and he made that to be true.

    w.  On about May 30th, 2017; the CEO of the clinic flew into a rage and kick Dr. Stafford off of his office facility meeting. The next day, he kicked Dr. Stafford off the premises. Dr. Stafford acknowledged his actions via a text message. (Exhibit 3).

    x.  None of Dr. Stafford's complaints were taken seriously. After Dr. Stafford When she reported the wig comment, she was told that was just another way of inviting Dr. Stafford to shop for wigs. Dr. Stafford did not want to wear a wig.

    y.  Based on race, staff members were changing Dr. Stafford's charts and filling prescriptions under her name who were not physicians (Exhibit 18).

10.)    Dr. Stafford had earned the clinic at least $1,200,000 in her direct patient care in less than nine months.

11.)    PRACTITIONER conducts herself in a manner which discredits the ACHC, or is detrimental to the reputation, character, and standing of the ACHC. Is in the ACHC agreement. ACHC believed Dr. Stafford's complaint about her receiving the "n-word" text was detrimental to the reputation of ACHC where they enforced their zero tolerance policy and terminated Dr. Stafford's employment through a constructive discharge.

12.)    Dr. Phui was granted credit of earning a score of 98 percent in the health center's audit and Dr. Stafford was not granted credit for contributing to the score although she did because of her race.

13.)    Dr. Stafford's award of the fellowship was considered insignificant to the facility because of her race.

14.)    Dr. Stafford was required by her employer to also complete the UCSF fellowship as a representative. When Dr. Stafford was chosen to represent the community for healthcare through the UCSF fellowship in connection with the California Department of Public Health, Dr. Phui and the CEO and others stated it was irrelevant because of Dr. Stafford's race. All of Dr. Stafford's accomplishments were considered insignificant because of her race at the facility. (Exhibit 9) (Exhibit 12)

15.)    The facility expressed to Dr. Stafford that the use of the n-word in the workplace should not be offensive to Dr. Stafford.

16.)    ACHC cancelled Dr. Stafford's work meeting for the Opioid program that Dr. Stafford grew at the clinic because she reported the incident of the N-word.

17.)    It was an administrative decision to end Dr. Stafford's employment with severance because of her reports of discrimination. (Exhibit 4)

18.)    The CFO and the CEO had no concern over ending Dr. Stafford's employment with a one-day notice with severance.

19.)    Plaintiff wrote on May 26th: "My goal is to complete our agreement of three years and to complete my Fellowship at UCSF. If you have other goals in mind for me, then please let me know within 72 hours." The CEO retaliated because Dr. Stafford reached out to the administration about the n-word being used amongst the staff at the center.

20.)    Avenal Community Health Center believed Dr. Stafford's complaint about her receiving the "n-word" text was detrimental to the reputation of ACHC.

21.)    Dr. Stafford was working hard trying to improve community care and her work was interrupted because of her race.

22.)    The CFO had reached out to Dr. Stafford about growing the opioid program. Dr. Stafford was not acknowledged for her contribution and growth of the opioid clinic because of her race. Dr. Phui was the sole and only physician that was acknowledged for growing the opioid clinic based on the race of Dr. Stafford. (Exhibit 11) (Exhibit 17)

23.)    The CEO discriminated as he retaliated against Dr. Stafford for making a complaint about work place harassment and terminated her employment. The CFO discriminated as he retaliated against Dr. Stafford for making a complaint about work place harassment and terminated her employment.

24.)    The CEO stated that the Dr. Stafford's report was breaking the trusting relationship she had with her team. He stated this based on the race of Dr. Stafford.

25.)    Dr. Stafford sent a text message to the CEO stating that on May 12th a physician from Adventist Health wanted to speak with him about the EHR. The CEO ignored the text message from Dr. Stafford because he believed she was inferior. (Exhibit 6)

26.)    On May 31st, Dr. Stafford sent a message to the CEO confirming he was not allowing Dr. Stafford to see her patients anymore via a text message. The CEO did this because he was angry about the complaints Dr. Stafford had made about the race relations at the facility.

27.)    The CEO emailed to Dr. Stafford on about April 28th, 2018. "we take into account the peer review findings when we are contemplating the reappointment.". After the text message publishing the "n-word" where Dr. Stafford was the only African-American individual to receive the message amongst the staff, the CEO created a peer review process which is out of his jurisdiction. He did this because after the publishing of the n-word, he saw Dr. Stafford disparagingly. (Exhibit 20)

28.)    Dr. Phui was referred to as a doctor at the clinic. Dr. Stafford was referred to at the clinic other than a physician because of her race. Dr. Stafford's charts were not identified as doctor like Dr. Phui's because of her race. (Exhibit 14)

29.)    Dr. Stafford is not a user of marijuana. Although Dr. Stafford fully understands that many people choose to use marijuana for health benefits with improved health outcomes, the clinic referred to Dr. Stafford as using marijuana because of racial bias. Although Dr. Stafford does not use marijuana and never claimed to be using marijuana, the clinic broadcasted that she was a smoker of marijuana because of her race. This was untrue. Dr. Stafford was not using marijuana at the facility or at home. Dr. Stafford did not smoke at the facility or at home. She was not a smoker but she was portrayed as a smoker based on her race.

30.)    The CFO emailed Dr. Stafford and told her the CEO was impressed with her resume. However, the CFO stated that he was not impressed with Dr. Stafford's resume. This indicated that the hiring of Dr. Stafford was a way to lure her to the area and then to harass her once she made major life changes to work in the community.

31.)    Dr. Stafford implemented the growth of the use of psychotropic medications at the

facility. Although. Dr. Stafford was the physician that implemented the psychotropic medication use at the facility, she was not given any credit for this because of her race. Also based on race, Dr. Stafford's patients were shuttled to Dr. Phui. (Exhibit 15)

32.)     In order to qualify for continued receipt of federal funding, ACHC is required by the Health Resources and Services Administration ("**HRSA**")/Bureau of Primary Health Care ("**BPHC**") to not discriminate based on race.

33.)     ACHC discriminated based on race. Additionally, they did not encourage the staff to treat Dr. Stafford as a physician based on race.  (Exhibit 16)

34.)     Dr. Phui assisted in the discrimination based on race when he had a professional duty as a physician to not support the discrimination.

35.)     Dr. Stafford received zero apology for the use of the n-word in the workplace. (Exhibit 5)

36.)     Dr. Stafford was considered on-call at the facility 24 hours a day 7 days a week during her entire employment.

37.)     The medical assistants are to be the subordinates of Dr. Phui. However, based on race, ACHC allowed individuals without degrees in medicine to be supervisors of the medical assistants which is unlawful. Dr. Phui and ACHC did this based on race.

38.)     Members of the healthcare team texted responses that were considered enthusiastic, including Christina Castaneda, who sent a text reply "Maaaaa nigga!!!!," followed by a picture of clapping hands. Dr. Stafford was offended by the message. At least one individual

on the team did not have a problem with the text. Dr. Stafford had a problem with the text and was retaliated against because she did not approve of this work being used in the workplace. At least one other at the facility outside of Dr. Stafford believed the use of the n word is not appropriate.

39.)     Dr. Stafford believed that statements were made with intent to cast doubt upon the credibility, viability and marketability of the Plaintiff. Although the Plaintiff earned the facility over $100,000 per month as a physician providing care, she was treated badly based on her race. Additionally, Dr. Stafford's achievements at the facility were down played or flat out ignored because of race.

40.)     Dr. Stafford received a message which stated the following: "Go back to Africa where you came from Bitch!!!" According to management at AHCH an after-hours messaging saying "Go back to Africa where you came from Bitch!!!" from a staff worker is considered to be a case per case matter at the health center. In other words, presumably after hours hate speech is not considered inappropriate at ACHC even under circumstances that an employee is receiving statements they believe are harassing from other employees. (Exhibit 7)

41.)     ACHC fraudulently induced the Plaintiff to come to work for ACHC in order that ACHC would qualify for a federal grant. ACHC specifically choose Dr. Stafford via an online search and targeted Dr. Stafford based on her race. ACHC believed that because of Dr. Stafford's race, it would be really easy to get rid of her once they received the federal funds.

42.)     ACHC did not give Dr. Stafford credit for earning the facility more than one million dollars in nine months because of the race of Dr. Stafford.

43.)     The CEO stated Dr. Stafford did not have a contract. He made this statement as a

threat and also because of the race of Dr. Stafford. The CEO believed that a contract did not

apply to Dr. Stafford.

44.)     After Dr. Stafford was discharged or arguably constructively discharged as she was

harassed off the ACHC premises, her position was placed by a nurse because the nurse was

considered just as capable or more capable than Dr. Stafford based on Dr. Stafford's race.

45.)     Dr. Stafford was part of hiring staff until she was demoted in the growth of the

program until she was demoted after the use of the "n- word"

46.)     Dr. Stafford had a certificate for opioid patient treatment from the Federal

Government.

47.)     Dr. Stafford was bringing healthcare improvements to the entire community. This was

disregarded by ACHC because of Dr. Stafford's race.

48.)     ACHC has a zero-tolerance policy which meant they had to get rid of Dr. Stafford

because of the N-word.

49.)     On May 31st, Dr. Stafford sent a message to the CEO confirming he was not allowing

Dr. Stafford to see her patients anymore via a text message.  The CEO did this because of Dr.

Stafford's race.

50.)     The CEO discriminated as he retaliated against Dr. Stafford for making a complaint

about work place harassment. Dr. Stafford experienced economic loss because she was not at

her facility in Los Angeles, regularly because of the commitment she made with the facility.

- 15 -

51.)    As the clinic started retaliating, Dr. Stafford no longer was allowed a support staff like Dr. Phui. Dr. Stafford replaced by a non-African American and a non-physician.

## CAUSE OF ACTION

52.)    Plaintiff believes and therefore claims that when ACHC hired Dr. Stafford that the ACHC hired Dr. Stafford with the purpose only of qualifying for grants, had Dr. Stafford move to the location which is a distance equal or greater than 200 miles away from her office on San Vicente Blvd. with the only purpose of hiring her to qualify only for Federal grant(s) (at least one). After the center qualified for the grant(s), based on Dr. Stafford's race she was harassed based on her race knowing that Dr. Stafford would not be accepting of race based bias on the job. Once Dr. Stafford reported the race based bias, including the use of the N-word at work, rather than the zero tolerance policy to those who harassed Dr. Stafford on the job, including throwing a pen at Dr. Stafford, it meant that the target of the harassment, Dr. Stafford was forced off the premises.

53.)    Khuon Phui, D.O. and ACHC allowed discriminatory acts happen to Dr. Stafford based on her race. Although they had the power to correct the situation they did not because they wanted Dr. Stafford off the facility because of her race.

54.)    Khoung Phui, D.O. and ACHC violated Dr. Stafford's civil rights by having her to undergo separate treatment because of her race. This separate treatment included disparaging remarks, such as essentially no corrective action for the n-word being used in the work environment and the retaliation that occurred after Dr. Stafford complained of the incident.

(Exhibit 13)

55.)     Dr. Stafford's complaint was clear to the facility and it was her dislike of the increasing hostile behavior towards Dr. Stafford. For example, the use of the n-word, being accused of possibly stealing the computer, being accused of using marijuana (when she does not), her medical charts were altered, non-physicians were ordering drugs on her license without her approval, being excluded from events.

56.)     Dr. Stafford rights were violated by Dr. Phui and the ACHC when they did not address the continued discrimination at the facility.

57.)     Dr. Phui was the medical director and was negligent in not addressing the n-word in the workplace and then made statements in connection to Dr. Stafford which were not categorically true based on race discrimination.

58.)     ACHC was negligent in not preventing the violation of Dr. Stafford's civil rights after Dr. Stafford made multiple reports.

59.)     Dr. Stafford was damaged in an amount greater than $600,000 from the loss of employment based on ACHC and Dr. Phui's negligence.

60.)     The contract applied to Dr. Stafford differently because of her race. For instance, other healthcare professionals who were leaving the facility were allowed to see their patients where Dr. Stafford was basically "kicked" off the premises with insults such as inferences that she may steal the computer.

61.)     Due to Dr. Stafford's race, the facility wanted Dr. Stafford to quit representing the

clinic through the fellowship.

62.)     Plaintiff has incurred and continues or will incur legal expenses and attorney's fees. Plaintiff is presently unaware of the precise amount of these expenses and fees and prays leave of court to amend this Complaint when the amounts are more fully known and also when she retains an attorney.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays judgement against Defendant, and each of them, as follows:

1.) For compensatory damages including, damages or emotional distress and pain and suffering, in an amount according to proof and in excess of ten times the damages for discriminating based on race in violation of section 1981;

2.) For Compensatory damages for loss.

3.) For punitive damages in an amount to punish Defendant and deter others from engaging in similar misconduct;

4.) Damages for violation of section 1981.

5.) Consequential damages for violation of section 1981.

6.) Punitive damages for retaliation in violation of 1981

7.) Punitive damages for violation of Federal Civil Rights

8.) Compensation for past economic loss.

9.) Compensation for future economic loss.

10.)    Economic loss for lost profits.

11.)    Economic loss for future profits.

12.)    For interest on all sums as allowed by law;

13.)    For reasonable attorney's fees and cost of suit; and

14.)    Such other relief as this Court deems just and pro

Dated:  Monday November 19th , 2018

Vivi Stafford, MD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1

10/25/2018                                DCA - Search Details

# OSTEOPATHIC MEDICAL BOARD OF CALIFORNIA

## LICENSING DETAILS FOR: 11007

**NAME:** PHUI, KHUONG CUN
**LICENSE TYPE:** OSTEOPATHIC PHYSICIAN AND SURGEON 20A
**PRIMARY STATUS:** LICENSE RENEWED & CURRENT
**ADDRESS OF RECORD**
PO BOX 580
LEMOORE
LEMOORE CA 93245-0580
KINGS COUNTY

**ISSUANCE DATE**
NOVEMBER 2, 2009
**EXPIRATION DATE**
MARCH 31, 2019
**CURRENT DATE / TIME**
OCTOBER 25, 2018
10:47:12 PM

## PUBLIC RECORD ACTIONS

- ADMINISTRATIVE DISCIPLINARY ACTIONS (NO RECORDS)
- COURT ORDER (NO RECORDS)
- MISDEMEANOR CONVICTION (NO RECORDS)
- FELONY CONVICTION (NO RECORDS)
- MALPRACTICE JUDGMENT (NO RECORDS)
- HOSPITAL DISCIPLINARY ACTIONS (NO RECORDS)
- ISSUED WITH PUBLIC LETTER OF REPRIMAND (NO RECORDS)
- ADMINISTRATIVE CITATION ISSUED (NO RECORDS)
- ACTION TAKEN BY OTHER STATE/FEDERAL GOV (NO RECORDS)
- ARBITRATION AWARD (NO RECORDS)
- MALPRACTICE SETTLEMENTS (NO RECORDS)

## SURVEY INFORMATION

THE FOLLOWING INFORMATION IS SELF-REPORTED BY THE LICENSEE AND HAS NOT BEEN VERIFIED BY THE BOARD.

| | |
|---|---|
| **ARE YOU RETIRED?** | NO |
| **ACTIVITIES IN MEDICINE** | PATIENT CARE - 40+ HOURS<br>ADMINISTRATION - 1-9 HOURS |
| **PATIENT CARE PRACTICE LOCATION** | ZIP - 93245<br>COUNTY - KINGS |
| **PATIENT CARE SECONDARY PRACTICE LOCATION** | NOT IDENTIFIED |
| **TELEMEDICINE PRACTICE LOCATION** | ZIP - 93204<br>COUNTY - KINGS |
| **TELEMEDICINE SECONDARY PRACTICE LOCATION** | NOT IDENTIFIED |
| **CURRENT TRAINING STATUS** | NOT IN TRAINING |
| **AREAS OF PRACTICE** | FAMILY MEDICINE - PRIMARY |
| **BOARD CERTIFICATIONS** | AMERICAN BOARD OF ORTHOPAEDIC SURGERY - ORTHOPAEDIC SURGERY |
| **AOA BOARD CERTIFICATIONS** | AOA - FAMILY PHYSICIANS |
| **POSTGRADUATE TRAINING YEARS** | NOT IDENTIFIED |

**CULTURAL BACKGROUND**  DECLINED TO DISCLOSE

**FOREIGN LANGUAGE PROFICIENCY**  DECLINED TO DISCLOSE

**GENDER**  DECLINED TO DISCLOSE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 2

# Avenal Community Health Center

405 West D Street • P.O. Box 580 • Lemoore, CA 93245 • Ph. (559) 386-4500 • Fax (559) 282-5080

May 31, 2017

Dr. Stafford                                              via email to vstafford@ariachc.org

RE:    Complaints

Dr. Stafford,

This memo is to confirm that we discussed at length the each of the harassment and discrimination complaints you had raised in your previous correspondence. As was stated previously, ACHC has a zero-tolerance policy for these things and we are promptly investigating them to the full.

If not already done so, Mr. Mungur will be contacting you shortly confirming your requested personal day off on Thursday. We are looking to see how on a short notice we can best accommodate the patients that are on your schedule for that day.

Sincerely,

John Blaine, CEO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 3



**John Blaine**

May 31, 2017, 6:33 PM

This is a confirmation that you are not permitting me to finalize all of my records. This includes an intense chart review, review of labs, review of pending consultations and despite the fact that this may not be in the patients best interest, you are refusing to let me do my duty as a physician which is a proper sign out. Confirm with me today that you are refusing for me to complete my final chart review for the patients. Although your refusal might be to the patients detriment. Also, within the refusal you instructed me that I am no longer allowed to see patients, despite the potential harm this might cause without a proper wrap up. Please notify me of your position this evening. If I here no response, then I have no choice but to contact the medical board in the morning to notify that you have chosen and Dr. Phui agrees for me to not do my final review, although it may be for the benefit of the patient

  

      



John Blaine

in the patients best interest, you are refusing to let me do my duty as a physician which is a proper sign out. Confirm with me today that you are refusing for me to complete my final chart review for the patients. Although your refusal might be to the patients detriment. Also, within the refusal you instructed me that I am no longer allowed to see patients, despite the potential harm this might cause without a proper wrap up. Please notify me of your position this evening. If I here no response, then I have no choice but to contact the medical board in the morning to notify that you have chosen and Dr. Phui agrees for me to not do my final review, although it may be for the benefit of the patient to do my final review. For clarity sake, please email me or text me your position. Clarify that you are refusing for me to see patients during the month of June. Please do so tonight.

Delivered

    

      

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 4



# Avenal Community Health Center

405 West D Street • P.O. Box 580 • Lemoore, CA 93245 • Ph. (559) 386-4500 • Fax (559) 282-5080

May 31, 2017                                                    By personal Delivery

Vivi Stafford, MD
539 Centennial Dr., Apt. A
Hanford, CA 93230

Dr. Stafford,

This letter serves as a formal acknowledgement and acceptance of your voluntary termination, per the terms of your agreement noted in Section 5B. Your 30 day notice indicated you would work through June 30, 2017. However, given the circumstances we have determined that it is appropriate that we pay you a severance for that time, rather than have you working on site until the end of June. We have arranged for others to take over the care of the patients that are on your schedule from now forward.

Enclosed with this letter are these paychecks. If you feel anything was omitted, please let us know immediately:
1. The first is for the two-week pay period ended June 3, 2017,
2. The second check is for pay period from June 4 through June 17, 2017 and
3. The third check is for pay period from June 18 through June 30, 2017.
4. The fourth check is for any unpaid vacation that was available as of today, plus what would have been accrued by June 30, 2017.

Additionally, we will cover the present healthcare premiums for you through June 30. However, for coverage beyond that date you will need to submit the required documentation for coverage through the appropriate COBRA program.

As is standard for all our employees, we ask that you please return any and all property belonging to Avenal Community Health Center, including but not limited to, keys, reports, charts and other resources. Also, please remember to remove all of your personal property before you leave. As you know, the laws relating to confidentiality extend beyond your term of employment, and you should not discuss nor disclose any protected patient information or any other protected information you received while working for this organization.

Sincerely,

Hemanta Mungur
CFO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 5

# Avenal Community Health Center

405 West D Street • P.O. Box 580 • Lemoore, CA 93245 • Ph. (559) 386-4500 • Fax (559) 282-5080

May 25, 2017

Dr. Stafford                                    via email: vstafford@ariachc.org

     Re:    Formal complaint response

Dear Dr. Stafford:

    I am in receipt of your May 25, 2017, email sent at 7:40 this a.m. I am surprised and disappointed. The statements included in the first paragraph of your email are patently incorrect. At no time during our meeting did anyone state or imply that you were to keep your complaints and concerns to yourself, or place them in a "little white box."

    Our discussion was about separating two disparate issues: ACHC peer review and the process and the unrelated issue from March 8, 2017, regarding derogatory comments made by a staff member. You agreed separation of these issues was appropriate.

    ACHC has a zero tolerance policy for harassment and discrimination. Thus, in response to the derogatory comment issue you raised, we immediately handled the matter as required by law and the ACHC Handbook. An investigation was conducted, personnel were spoken to, and appropriate steps were taken, including employee re-education, that derogatory language is not tolerated in the workplace, and to inform them that even "after-hours" communications can impact the workplace when shared with workplace colleagues. ACHC's policy against harassment and discrimination in the workplace was reviewed with the staff.

    You confirmed during our Monday meeting that you were satisfied with the above approach and agreed to move forward. However, your current assertions of threats or threatened ramifications resulting from your complaints is simply untrue.

    It appears you are now lodging further complaints. ACHC will address these promptly beginning with an investigation.

Should you wish to discuss these issues further, please contact me immediately.

Sincerely,

John Blaine, CEO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 6



**J**

John Blaine

May 12, 2017, 7:06 PM

John, the physician, from Adventist Health, whose name is also John is truly looking forward to speaking with you about the EHR. He mentioned in person or via phone/cell. My impression is his preference would be in person, if given the option. If you choose in person I would like to attend also, if reasonably possible, as we are on the Kings County cohort together. Please let me know, at your convenience, your preference so I can update John from Adventist in the near future. He is most definitely looking forward to speaking with you soon. Thank you, very much. Vivi

May 22, 2017, 8:57 AM

I just sent an email to you regarding your email this morning.

I just arrived at work. Will read it and respond.

  
      

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 7



Vivi  Home

Brandon Franks

Brandon Franks

Options

Search in Conversation

Notifications

JUL 25TH, 7:48PM

Go back to Africa where you came from, Bitch!!

Brandon Franks

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 8



**Jennifer Smith**
To Vivi Stafford
Mar 1, 2017

View More

I was able to locate the document with the nitty gritty details:

http://champion.ucsf.edu/sites/champion.ucsf.edu/files/CPF%20Healthcare%20Provider%20Benefits.pdf

**Here is the basic lowdown:**

What are the requirements of the Fellowship?
· Mandatory attendance at the two-day onboarding training on May 5-6, 2017 (Friday and Saturday)
· Spend approximately 5 hours per month planning obesity prevention policy activities in collaboration with your local health department
· Participate in one day-long skill-building workshop per year for two years
· Meet with your LHD representative at least twice per year

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 9



# Employer Letter of Support
## Champion Provider Fellowship Applicant

On behalf of *Avenal Community Health Center* I am writing to support *Dr. Vivi Stafford's* application to the Champion Provider Fellowship.

I understand that Champion Provider Fellows may ask to take time away from clinic to attend CME courses related to the Champion Provider Fellowship but that there is no specific employer commitment of time to the fellowship from the employer.

I also understand that Champion Provider Fellows can play a pivotal role in addressing obesity and chronic disease in their community. Champion Provider Fellows will be educated on advocacy v. education and their ability to affect change through an upstream approach. I understand that Champion Provider Fellows may engage in media interviews and provide testimony to public entities as private citizens but will not be representing our organization through such activities.

Sincerely,

John Blaine, CEO

Avenal Community Health Center (dba Aria Community Health Center

jblaine@ariachc.org, (559)386-4500 x1010

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 10

On Jun 30, 2016, at 9:38 AM, Hemanta Mungur <
hemantamungurviaindeed8_ywq@indeedemail.com > wrote:

Hello Dr.Stafford,

I found your resume on Indeed. Please reply to this email if
you are interested in discussing the Staff Physician position
with our clinic, I could be reached at 559-346-9324

**Message from Hemanta Mungur at Aria Community
Health Centers.**

**Interested?** Reply to this email to contact Hemanta Mungur. Your
contact details will be shared when you reply.

**Not interested?** Decline - Your contact details will not be shared.
Report Spam - This message is suspicious or fraudulent.

JOB DETAILS
**Job Title:** Physician Position
**Company:** Aria Community Health Centers

Aria Community Health Center located in Lemoore, CA (1
hour south of Fresno) is seeking a Physician for our Family
Practice Clinic.

Competitive Salary $280K + bonus and Benefits
Loan Repayment eligibility
Please email your resume or call 559-346-9324
Located 1 hr south of Fresno,CA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 11

## American Society of Addiction Medicine, Opioid Addiction 2016 Facts & Figures

- Opioids are a class of drugs that include the illicit drug heroin as well as prescription pain relievers oxycodone, hydrocodone, codeine, morphine, fentanyl and others.

- Addiction is a primary, chronic and relapsing brain disease characterized by an individual pathologically pursuing reward and/or relief by substance use and other behaviors.

- Of the 21.5 million Americans 12 or older that had a substance use disorder in 2014, 1.9 million had a substance use disorder involving prescription pain relievers and 586,000 had a substance use disorder involving heroin.

- It is estimated that 23% of individuals who use heroin develop opioid addiction.

---

- Opiáceos u opioides son una clase de drogas y medicamentos que entre ellos se incluye la droga ilícita como la heroína, así como los medicamentos prescritos legalmente como los analgésicos como, oxicodona, hidrocodona, codeína, morfina, fentanilo y otras.

- La adicción es una enfermedad cerebral primaria, crónica y recurrente que se caracteriza por un individuo en busca de recompensa de forma patológica y/o alivio mediante el uso de sustancias y otros comportamientos.

- De los 21.5 millones de estadounidenses mayores de 12 años que han tenido un trastorno por uso de sustancias en el 2014, 1.9 millones han tenido un trastorno por uso de sustancias como los analgésicos recetados y 586,000 han tenido un trastorno por uso de otras sustancias como la heroína.

- Se estima que el 23% de las personas que usan heroína desarrollan adicción a los opioides

### www.ARIACHC.org

---

Our team is designed especially to ensure you receive all the support you need.



### Dr. Khuong Phui, D.O.



### Dr. Vivi Stafford, M.D.

### & Case Managers

Guide the patient throughout the program, and can answer questions about the process.

### y los Encargados del Caso

Guían al paciente a través del programa y pueden responder a preguntas sobre el proceso.

Nuestro equipo está especializado principalmente para este programa y así asegurar que reciba todo el apoyo que necesite.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 12





Home  >  About  > Champions Roster

# Champions Roster

stafford

Sort by name          Sort by cohort          Sort by region



## Vivi Stafford, MD

### Aria Community Health Center
Kings, CA

Dr. Stafford has a BA in Anthropology from the University of Southern California, and obtained her medical degree from the University of Minnesota in 1999. She did her general surgery internship at Mount Sinai Medical Center in New York, where she was on trauma call during the events of 9/11. Dr. Stafford is in the process of earning a Master's in Public Administration from USC. She wants to focus her medical career on public policy because policies have the potential to save lives en masse. As a primary care and addiction medicine physician, Dr. Stafford wants to apply her intersectional knowledge of healthcare, public policy, and the legal system in curbing the rise of chronic disease. As a Champion Fellow based out of Lemoore (an agricultural community where nearly one in five people live in poverty), she will work with Central Valley communities to ensure increased access to primary care, and to campaign for preventative healthcare policies.

Champion Provider Fellowship 2017 Cohort

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 13

  

## John Blaine
To Vivi Stafford

May 22, 2017

View More

Vivi Stafford MD

It has been my experience that it often takes more than a day to get a call back from the medical board. I have also found that while there are advantages to put things in writing, it is valuable to have had a dynamic conversation so that the parties can ferret out the essence of the questions to be answered. Without your questions in hand I cannot know for sure, but given that I think we **agree** that our peer review form questions **do NOT** in and of themselves create a reportable condition, I do not see your urgency.

I began looking into your email on Friday, and I am concerned that while there are **important issues** to address, the conclusions you have drawn and built upon, do not appear to be correct.

I would encourage you to:

No Internet Connection

    

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 14

8:24 PM    55%

**From:** Karla Campos

Hello,

The following need to renew their status:

-Douglas Smith PA License expires 1/31/2017 will he renew? Not necessary, but will like to know
-Dr Phui: Life Support Training EXPIRED if he has a recent please submit.
-Cristal: Current DL *(ALREADY UPDATED)*
-I don't have physical/TB current records for:
-Christina
-Paula
-Danelle
-Beatriz
-Dr Phui
- Alan
-Douglas
-Vivi
-Jenny

No Internet Connection

Mail    Calendar    Files    People    Settings

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 15



↩ Reply all | ⌄    🗑 Delete    Junk | ⌄    •••    ✕

# RE: Psychiatric Services

VS    **Vivi Stafford**    👍    ↩ Reply all | ⌄
Tue 2/28, 10:15 AM
Jennifer Smith; Khuong Phui ⌄

Sent Items

Yes, absolutely. I prescribe a lot of psychotropic medications and have done so for years. In fact, did extensive research with them in medical school.

I would love to see all the Champion patients when referred. We are treating some of the patients already and it would be fantastic to have all of their referrals.

How can we get directly connected with their referrals so we can accommodate their healthcare needs on demand? Let me know, at your convenience.

Kind regards.
Vivi

**From:** Jennifer Smith
**Sent:** Monday, February 27, 2017 1:25 PM
**To:** Khuong Phui <kphui@ariachc.org>; Vivi Stafford <vstafford@ariachc.org>
**Subject:** FW: Psychiatric Services

Hello,

I have received a question via email from the Director of Champions.  Do you prescribe psychotropic drugs?  The email below is from Crystal, the Director,  and she explains why she is asking.

Jennifer Smith
Avenal Community Health Center
dba Aria Community Health Center
1000 Skyline Blvd.
P.O. Box 700
Avenal, CA  93204
jsmith@ariachc.org
(559)386-4500 Ext. 1011
(559)282-5090
www.ariachc.org

**From:** Crystal Hernandez [mailto:chernandez@championsrecovery.org]
**Sent:** Monday, February 27, 2017 1:21 PM
**To:** Jennifer Smith <jsmith@ariachc.org>
**Subject:** RE: Psychiatric Services

STAFFORD - WRONGFUL TERMINATION 5223

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 16



AT&T Wi-Fi    10:06 PM    57%

‹ 110

**HM**

Hemanta

May 25, 2017, 5:49 PM

Hemanta: At the end of the day, I had a couple of questions to ask. But, there was no one there to answer my questions. In fact, there was new staff there. Is the organization retaliating against me because I feel discriminated against? It seems that everything has changed. In fact, someone served me papers today. What was I served for?

No what papers were served? Call me asap

May 25, 2017, 7:03 PM

Hemanta: Please as Dr. Phui what was handed to me today. He was sitting right there. Please let me know. I was handed some papers and he wasn't.

Ok can u send me a picture of the content

  

      

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 17

 AT&T Wi-Fi **10:11 PM**  57% 


**Hemanta**

Mar 23, 2017, 9:26 AM

Good morning Hemanta: I was wondering about your thoughts on Doug Smith engaging some of the behavioral health patients? He seems excellent in engaging patients in that capacity. What do you think? His quality care could be easily superior compared to the counseling because he can prescribe. I know the behavior meds well, mood stabilizers and antipsychotics and I could be available if he wanted to prescribe. Patients could see him more frequently and Dr. Sheldon when Dr. Sheldon is available. Since he is going to take the Suboxone course soon this could be a nice option for continuous care and I could refer to him easily? There is a demand in my opinion.There are a lot of work flows available too. Patterns for change: smoking cessation protocols and etc. Let me know if this sounds like an option? When I asked him if he was interested in seeing some of

  

      



antipsychotics and I could be available if he wanted to prescribe. Patients could see him more frequently and Dr. Sheldon when Dr. Sheldon is available. Since he is going to take the Suboxone course soon this could be a nice option for continuous care and I could refer to him easily? There is a demand in my opinion.There are a lot of work flows available too. Patterns for change: smoking cessation protocols and etc. Let me know if this sounds like an option? When I asked him if he was interested in seeing some of my patients for behavioral health he seemed to find a lot of interest. So just felt like getting your perspective on this. Doug actually is sort of like a natural Dr. Phil or so. Let me know at your convenience.

Yeah ok with me as long as he udon board and feels confident.

I heard about the nasty patient yesterday

  
      

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# Exhibit 18

24
25
26
27
28

 AT&T LTE                1:50 PM                @ ✈ ✳ 74% ▬



**Hemanta**                                                  

Hemanta: For some reason today my computer is not sending medications? I tried on one patient we wrapped up. Will try on another right now.

Ok I will have Jen call u

Hemanta: Arely is just ignoring what I am saying entirely. I am not comfortable with it.

Oh boy hold on

Can I call you in 15 minutes?

Yes

Ok. Thanks.

A couple of patients are here. Will definitely call you when there is a break. Hope that is ok.

Yeah anytime

                                         

      

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 19

## Attendees - By Family

1 **John Blaine, CEO**
   Connie Blaine

2 ***Aaron Dykstra, DNP**
   *Stefani Dykstra
   *Kaiya, 5 yrs
   *Noah, 3 yrs
   *Maliyah, 1 yr
   *Brielle, 1 yr
   *Taija, 15 yrs

3 **Linda Hudson, PA**
   Steve Hudson

4 **John Kalfayan, Director of Quality**

5 **Luisa Moreno, RDH**
   Merced Moreno
   Michael, 13 yrs
   Aden, 3yrs

6 **Hemanta Mungur, CFO**
   Patricia Mungur
   Ishan Mungur, 3yrs
   Alisha Mungur, 2yrs

7 **Mark Newsum, DCM**
   Carlene Newsum

8 **Khuong Phui, DO**
   Lauren Phui
   Jacob Phui, 15 yrs
   Spencer Phui, 13 yrs
   Mei Phui, 7 yrs

9 **Alan Pratt, Director of Operations**

10 **Vanessa Pulido Danier, DDS**
   Cameron Danier
   Kaira Pulido, 9 yrs

11 Jeffrey Ring, PhD (Trainer)

12 **Chuck Smith, FNP**
   Ellen Smith
   Elisha Smith, 2 yrs

13 **Doug Smith, FNP**
   Yrene Smith

14 **Jennifer Smith, Community Resource Specialist**

15 **Vivi Stafford, MD**
   Julio Sixto Palacios

16 **Alex Tamayo, FNP**
   Jessica Tamayo

17 **Veronica Vo, PA**
   Tracy Le
   Hieu Nguyen

18 **Lali Witrago, HealthNet**
   Alicia Alvarado, HealthNet

*One day use only (4/29/17)          **Bold Name** = Employee of ACHC          STAFFORD 5010

# ACHC Clinician's Retreat
## Saturday, April, 29, 2017
### ACTIVITY SCHEDULE

| 2:00 PM | 3:00 PM | 4:00 PM | |
|---|---|---|---|
| **Paintball†** | **Climbing Wall** | **Extreme Swing** | **Climbing Wall** |
| Alex Tamayo | Aaron Dykstra | Mark Newsum | Linda Hudson |
| Veronica Vo | Stephanie Dykstra | Carlene Newsum | Steve Hudson |
| John Kalfayan | Jacob Phui | Jacob Phui | Alex Tamayo |
| Jacob Phui | Spencer Phui | Spencer Phui | Jessica Tamayo |
| Spencer Phui | Mei Phui | Mei Phui | Veronica Vo |
| Khuong Phui | Lauren Phui | Lauren Phui | Jennifer Smith |
| Jennifer Smith | Khuong Phui | Khuong Phui | |
| Alan Pratt | John Kalfayan | Veronica Vo | |
| John Blaine | | Alex Tamayo | |
| Connie Blaine | | Vanessa | |
| | | Cameron | |
| **Zipline*** | | Kaira Pulido | |
| Mark Newsum | | **FULL** | |
| Carlene Newsum | **Vertigo*** | **Vertigo*** | |
| Vanessa Pulido | Alex Tamayo | Jacob Phui | |
| Cameron | Jessica Tamayo | Spencer Phui | |
| Kaira Pulido | Veronica Vo | Khuong Phui | |
| Jessica Dykstra | Linda Hudson | Vanessa Pulido | |
| Aaron Dykstra | Steve Hudson | Cameron | |
| | Jennifer Smith | Kaira Pulido | |
| | | | |
| | **Zip Line*** | **Archery** | |
| | Jacob Phui | Alex Tamayo | |
| | Spencer Phui | Jessica Tamayo | |
| | Mei Phui | Linda Hudson | |
| | Lauren Phui | Steve Hudson | |
| | Khuong Phui | Khuong Phui | |
| | John Kalfayan | Jacob Phui | |
| | Veronica Vo | Spencer Phui | |
| | Alex Tamayo | Mei Phui | |
| | Jennifer Smith | Lauren Phui | |
| | | Veronica Vo | |
| | | John Kalfayan | |
| | | Jeffrey Ring | |
| | | Jennifer Smith | **Activities open for an hour at a time unless otherwise indicated.** |
| | | | † Must attend from start time |
| | | | * Open for 2 hours |

**Vertigo:** Max 10 people/hr   **Extreme Swing:** 12 people/hr
**Archery and Extreme Swing:** Max 20 people/hr each

STAFFORD 5009

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 20

•• AT&T  LTE                    12:17 PM                    @ ✈ ⁕ 82% ▬

**Details**                                              **Done**

**KP** Khoung Phui              ▸📹        💬        📞

**B** Betty                     ▸📹        💬        📞

👤 +1 (559) 572-3872                      💬        📞

👤 +1 (559) 380-7603           ▸📹        💬        📞

**D** Danelle                              💬        📞

**C** Crystal                   ▸📹        💬        📞

Hide


Send My Current Location

Share My Location


**Hide Alerts**

| Images | Attachments |
|--------|-------------|

 AT&T LTE    8:54 AM    75% ▪



6 People



I'm taking homemade arroz con leche (rice pudding) tomorrow for breakfast or dessert or both

Can someone forward to Paula I don't have her number

+1 (559) 380-7603

Maaaaa nigga!!!! 

Betty

Yum. Thanks my favorite

Crystal

Lol lol 

Danelle

